104 Ill. App.3d 586 (1982)
432 N.E.2d 1258
COTTAGE-63rd STREET CURRENCY EXCHANGE, INC., et al., Plaintiffs-Appellants,
v.
EDGAR F. CALLAHAN, Director of the Illinois Department of Financial Institutions, et al., Defendants-Appellees.
Nos. 81-130, 81-131 cons.
Illinois Appellate Court  First District (5th Division).
Opinion filed February 26, 1982.
James L. Coghlan and John A. Kukanos, both of Chicago (Coghlan, Joyce & Nellis, of counsel), for appellants.
Tyrone C. Fahner, Attorney General, of Chicago (Patricia Rosen, Assistant Attorney General, of counsel), for appellee Edgar F. Callahan.
Thomas J. Duffy and John L. Roach, both of Chicago, for appellee Thillens, Inc.
Orders affirmed.
JUSTICE MEJDA delivered the opinion of the court:
In separate actions plaintiffs, two licensed community currency exchanges, and the Community Currency Exchange Association of Illinois, *587 Inc., a not-for-profit corporation, brought complaints against defendants seeking declaratory relief that a "3% rule" allegedly used by Edgar F. Callahan, the Director of the Illinois Department of Financial Institutions (Director), in approving the applications of ambulatory currency exchanges was invalid and injunctive relief restraining its use as well as the operation of two of defendant Thillens, Inc., ambulatory currency exchanges whose applications were approved through the use of this "3% rule." Upon the Director's motion the trial court dismissed both complaints finding that the plaintiffs did not have standing to challenge the Director's approval of the Thillens' licenses. Plaintiffs appeal.
The sole issue raised on appeal is whether plaintiffs have standing pursuant to section 4.3 of the currency exchange act (Ill. Rev. Stat. 1979, ch. 16 1/2, par. 34.3) to challenge the issuance of ambulatory currency exchange licenses.
The pertinent allegations of plaintiff Cottage-63rd Street Currency Exchange's (Cottage) complaint include that in March of 1978 the Director approved a Thillens' application for a license to serve Woodlawn Hospital; that Cottage is located in the nearby vicinity of Woodlawn Hospital and cashes checks of some of the employees of Woodlawn Hospital; and that as a result of the Director's approval of the license, Cottage would suffer a decrease in net profits. In count I of its complaint, Cottage further alleged that section 4.3 of the currency exchange act (Ill. Rev. Stat. 1979, ch. 16 1/2, par. 34.3) requires that the Director, when investigating and considering a location license application of an ambulatory currency exchange consider "the effect that granting a license will have on the financial stability of the community currency exchanges"; that in considering such effect on financial stability the Director utilizes the "3% rule" in contravention to the rule-making procedures set forth in the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1979, ch. 127, par. 1001 et seq.); that the "3% rule" was applied to Cottage when the Director considered the Thillens' application to serve Woodlawn Hospital; and that the above actions of the Director rendered the granting of the license null and void. In count II Cottage realleged the allegations of count I and further alleged that the "3% rule" was arbitrary, unreasonable, capricious and inconsistent with the mandate of section 4.3 of the currency exchange act that the Director evaluate the effect that granting an ambulatory license will have on the financial stability of community currency exchanges; that the "3% rule" does not appear to have any reasonable or logical basis as a measure of the effect upon the financial stability of community currency exchanges; that the "3% rule" considers only the impact upon Cottage's gross revenues, whereas, Thillens actually competes with Cottage's check cashing business; that the "3% rule" ignores the impact upon Cottage's net income, the actual measure of impact upon the *588 financial stability of Cottage; and that the "3% rule" focuses only upon the economic impact upon a single community currency exchange, whereas section 4.3 mandates that the Director consider the effect upon the financial stability of all community currency exchanges. In both counts I and II, Cottage sought a declaratory judgment that the license issued was null and void, and an injunction restraining the Director from employing the "3% rule" and restraining Thillens from servicing Woodlawn Hospital.
In a separate action plaintiff Root and Halsted Currency Exchange's (Root) complaint consisted of four counts, all of which challenged the action of the Director in granting a license to Thillens to service the Zenith Electric Company, located 2 1/2 blocks from Root. Count I of the Root complaint alleged that Root cashes checks of some of the employees of the Zenith Electric Company and that as a result of the granting of the license to Thillens it would suffer a decrease in net profits. The allegations of count I and II of the Root complaint were essentially the same as those of the Cottage complaint. Count III of the Root complaint further alleged that in considering the financial impact upon Root and in granting the license to Thillens the Director did not follow its own "3% rule." Count IV (denominated "Count V`" in the complaint) alleged that the granting of the license to Thillens would have a severe financial impact on Root, could possibly force Root to cease operations, and that the action of the Director was arbitrary and unreasonable.
Thillens, Inc., filed an answer to Cottage's complaint. The Director filed a motion to dismiss the complaint of Cottage and a supporting memorandum which specifically raised the argument that Cottage did not have standing to challenge the Director's issuance of the license to Thillens. On August 22, 1978, that motion was denied. Subsequently, the Director filed an answer to Cottage's complaint.
After document production by the Illinois Department of Financial Institutions and the taking of the Director's deposition and that of Michael Fryzel, the Supervisor of the Currency Exchange Division of the Illinois Department of Financial Institutions, Cottage moved for summary judgment on counts I and II of its complaint. In his memorandum in response to Cottage's motion the Director again raised the argument that Cottage had no standing to contest the grant of the license to Thillens. The court made a specific finding that Cottage did not have standing to challenge the issuance of the license to Thillens, and dismissed Cottage's complaint. Cottage timely filed a motion to reconsider and vacate that order. The Director's motion to dismiss the companion Root complaint was set for ruling on the same date. On December 16, 1980, after a hearing, the trial court entered separate orders affirming the dismissal of Cottage's complaint and dismissing Root's complaint. In each order the trial court made a specific finding that the plaintiffs lacked standing to challenge the *589 action of the Director in granting the licenses to Thillens. Plaintiffs' appeals have been consolidated.

OPINION
 1 Essentially, there are two main, general requirements for standing where, as here, a party brings an action for declaratory relief. There must be an actual controversy and the party seeking relief must possess a personal claim, status or right which is capable of being affected. (Underground Contractors Association v. City of Chicago (1977), 66 Ill.2d 371, 362 N.E.2d 298.) Where a suit alleges injury due to the violation of a statute, the doctrine of standing requires that the plaintiff be one of the class designed to be protected by the statute or for whose benefit the statute was enacted and to whom a duty of compliance is owed. (Lynch v. Devine (1977), 45 Ill. App.3d 743, 359 N.E.2d 1137.) Plaintiffs do not and cannot base their claim of standing on the Administrative Review Act. (Ill. Rev. Stat. 1979, ch. 110, par. 264 et seq.; Roosevelt-Wabash Currency Exchange, Inc. v. Fornelli (1977), 49 Ill. App.3d 896, 364 N.E.2d 449.) Rather, plaintiffs assert that they have a statutory right to challenge the actions of the Director in issuing ambulatory licenses because they are members of a class protected by the currency exchange act and have suffered an economic injury in fact by the granting of the Thillens' licenses. Plaintiffs specifically and solely rely on the latest amendment to section 4.3 of the currency exchange act (Ill. Rev. Stat. 1979, ch. 16 1/2, par. 34.3), the section addressing the approval by the Director of ambulatory exchange licenses, as the basis for their assertion of standing. The previous version of this section stated in pertinent part:
"Upon receipt of an application from an ambulatory currency exchange for the conduct of its business at a location to be served by it, the Director of Financial Institutions shall investigate the need of the community for the establishment of such business at the location specified in the application. If the issuance of a license to engage in such business at the location specified will not promote the convenience and advantage of the community in which such business is proposed to be conducted, then the application shall be denied * * *." (Ill. Rev. Stat. 1975, ch. 16 1/2, par. 34.3.)
Under court construction of this section the convenience and economic advantage of the location for which the ambulatory application was made had been rejected as a proper criterion. (Thillens, Inc. v. Department of Financial Institutions (1962), 24 Ill.2d 110, 180 N.E.2d 494.) Furthermore, the sole test provided by this section was construed to be "`the convenience and advantage' of the community." (24 Ill.2d 110, 118, 180 N.E.2d 494, 498.) However, as currently amended section 4.3 (Ill. Rev. *590 Stat. 1979, ch. 16 1/2, par. 34.3, now at Ill. Ann. Stat., ch. 17, par. 4811 (Smith-Hurd 1981)) requires that:
"Upon receipt of an application from an ambulatory currency exchange for the conduct of its business at a location to be served by it, the Director of Financial Institutions shall cause an investigation to be made to determine whether to issue said license. The Director shall employ the following criteria in making his determination:
(1) the economic benefit and convenience to the persons to be served at the location for which a license has been requested;
(2) the effect that granting a license will have on the financial stability of community currency exchanges;
(3) safety benefits, if any, which may accrue from the granting of the location license;
(4) the effects, if any, which granting of a license will have on traffic, and traffic congestion in the immediate area of the location to be served;
(5) such other factors as the Director shall deem proper and relevant."
The purpose of the currency exchange licensing requirement is to insure against "[t]he unrestricted issuance of licenses in a community to the point of saturation [which] would tend to decrease the net earnings of each exchange to the point of insolvency of one or more of the exchanges with the inevitable result of losses to the public." (Gadlin v. Auditor of Public Accounts (1953), 414 Ill. 89, 95, 110 N.E.2d 234, 237.) Thus, the primary purpose of the currency exchange act has been held to be the protection of consumers served by currency exchanges. (First Financial Insurance Co. v. Purolator Security, Inc. (1979), 69 Ill. App.3d 413, 388 N.E.2d 17.) Plaintiff, however, contends that the amended language of section 4.3 evidences a clear legislative intent to protect the interests of community currency exchanges by bringing them within the class protected by the statute. We disagree.
 2, 3 In determining legislative intent it is presumed that the legislature acted with knowledge of judicial decisions concerning prior and existing law. (People v. Choate (1979), 71 Ill. App.3d 267, 389 N.E.2d 670; Nardi v. Segal (1967), 90 Ill. App.2d 432, 234 N.E.2d 805.) The amendment of this section clearly evidences a legislative intent to substitute the "community benefit" test previously applied in the approval of ambulatory licenses, with a "location benefit" criterion  a criterion which had been specifically rejected by previous judicial decisions. Furthermore, the Senate debate on the amended language indicates that the "effect that granting a license will have on the financial stability of community currency exchanges" was included to offset any competitive advantage *591 accruing to ambulatory exchanges by the utilization of the "location benefit" criterion rather than the "community benefit" test which potential community currency exchange licensees must still meet to secure licensing approval. (Transcript Senate Proceedings, May 26, 1977, at 99-100.) Thus, we conclude that the amendment to section 4.3 has not elevated the community currency exchange to the status of the consumer whom the act was originally designed to protect. It is further worth noting that the amendment to section 4.3 upon which plaintiffs rely occurred after this court's decision in Roosevelt-Wabash Currency Exchange, Inc. v. Fornelli (1977), 49 Ill. App.3d 896, 364 N.E.2d 449. There we held that the approval of community currency exchange license applications was not a final administrative decision reviewable under the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 110, par. 264 et seq.) because the currency exchange act imposed no duty on the Director of the Illinois Department of Financial Institutions to hold hearings, make findings or prepare or file a written order or decision when granting licenses. Similarly, no such procedure is required when granting ambulatory exchange licenses. We find it significant that notwithstanding the holding of Roosevelt-Wabash, the legislature, although amending section 4.3 in other respects, did not amend it so as to provide for administrative review of the Director's decision to grant ambulatory exchange licenses. We conclude therefore that section 4.3 in and of itself does not give plaintiffs standing to judicially challenge the Director's approval of ambulatory currency exchange licenses.
For the reasons cited herein the orders dismissing the respective complaints are affirmed.
Affirmed.
SULLIVAN, P.J., and WILSON, J., concur.